U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - ALEXANDRIA

MAR 2 7 2009

ROBERT H. SHEMWELL, CLERK
BY _____
          DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

JAMES HOUSTON HICKS,                    CIVIL ACTION
             Plaintiff                  SECTION "P"
                                        NO. CV08-0687-A
VERSUS

CORRECTIONS CORPORATION OF              JUDGE DEE D. DRELL
AMERICA, et al.,                        MAGISTRATE JUDGE JAMES D. KIRK
             Defendants


## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


Before the court are cross-motions for summary judgment filed by the parties in this case (Docs. 40, 76).

James Houston Hicks ("Hicks"), a pro se plaintiff, filed a civil rights complaint pursuant to 28 U.S.C. § 1983 on May 15, 2008, and amended on June 13, 2008 (Doc. 6) and June 24, 2008 (Doc. 7). The named defendants are Corrections Corporation of America ("CCA")(private operator of the Winn Correctional Center in Winnfield, Louisiana), Winn Correctional Center ("WCC")(a Louisiana state correctional facility),[1] Warden Tim Wilkinson ("Wilkinson")

---

[1] WCC is a state-owned correctional facility which is not capable of suing or being sued. Therefore, Hicks' action against WCC should be dismissed with prejudice.

(warden of WCC), Angie Martin ("Martin")(Assistant Warden at WCC), Tim Morgan ("Morgan") (Assistant Warden at WCC), Sara McCoy ("McCoy") (inmate banking supervisor at WCC), Mona Heyse ("Heyse"), C. Wiley ("Wiley") (ASH Unit manager), Security Chief Virgil Lucas ("Lucas"), Assistant Security Chief Tommy Glover ("Glover"), Connie Green ("Green")(canteen manager at WCC), Myrle Hardwell (manager of Elm Unit at WCC), Pat Thomas (medical director at WCC), and Dr. Pacheco (a physician employed at WCC), all employees of CCA working at WCC.[2]

Hicks contends that, while incarcerated in WCC since April 2, 2007, he has been constantly exposed to environmental tobacco smoke despite the fact that he is a non-smoker and suffers from severe bronchial asthma and high blood pressure. Hicks contends he remained on "smoking tiers" for ten months, until January 12, 2008, and then moved to a "fake non-smoking tier" on January 12, 2008, where he stayed to two months. Hicks contends he was then returned to a smoking tier for his "protection." Hicks contends defendants are aware that tobacco products are sold by the WCC canteen to

---

[2] Although Hicks named Myrle Hardwell, Pat Thomas, and Dr. Pacheco as defendants in his second supplemental amended complaint (Doc. 7), he never completed summonses for these defendants and no attempt was ever made to effect service. Accordingly, it will be recommend that the complaint against these defendants be dismissed without prejudice under Fed.R.Civ.P. 4(m). See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); Systems Signs Supplies v. U.S. Dept. of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988).

inmates in the "non-smoking tiers," and that neither inmate banking Supervisor Sara McCoy nor canteen manager Connie Green have flagged the accounts of those inmate housed on the non-smoking tiers to prevent them from purchasing tobacco products. Hicks further alleges WCC security personnel (Security Chief Lucas and Chief Tommy Glover) do not monitor or shake down the non-smoking tier to check for hidden tobacco products. Hicks contends defendants do not screen the smoking habits of inmates before placing them on "non-smoking tiers," do not monitor the "non-smoking tiers" for smoking, search for cigarettes, or do anything if an inmate is seen smoking, and that several inmates on those tiers smoke 24 hours a day. Hicks alleges that defendants profit from the sale of tobacco products in the canteen. Hicks contends that, since he has been confined in WCC, his breathing problems have been aggravated and his blood pressure has been elevated, but that the medical staff, Dr. Pacheco and Pat Thomas, have done nothing to relieve his medical problems.

Hicks asks for both monetary and injunctive relief, as well as a jury trial. Defendants answered the complaint (Doc. 38). Hicks filed a motion for summary judgment (Doc. 40), to which defendants filed a response in opposition (Doc. 64). Defendants then filed a cross-motion for summary judgment (Doc. 76), to which Hicks filed an opposition (Doc. 85). The parties' cross-motions for summary judgment are now before the court for disposition.

3

## The Law of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material". A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in

4

support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82(1992).

## Law and Analysis

Hicks contends in his motion for summary judgment and statement of undisputed facts (Doc. 40) that he was diagnosed with severe bronchial asthma and high blood pressure and prescribed inhalers (Atrovent, Qvar and Albuterol) at LSUMC-Shreveport before he was incarcerated, that he was housed in a smoking unit at WCC from April 2, 2007 through January 12, 2008, that he has been housed in a purportedly non-smoking tier in ASH unit since January

12, 2008, but that smokers are housed in the non-smoking tier, and inmates in the non-smoking tier are allowed to buy tobacco products in the canteen, as can be proven by the canteen receipts. Hicks contends his high blood pressure has been aggravated by breathing second-hand smoke which resulted in an increase of his medication (Catapres®),[3] and that he exhausts his asthma inhalers well before the thirty day limit of the prescription as a result of his exposure to ETS, which causes asthma attacks, suffering, and mental distress. Hicks further contends the defendants failed to have red flags put on the names of inmates housed on non-smoking tiers to prevent them from purchasing tobacco products, defendants failed to screen inmates for smoking before housing them in a non-smoking tier, defendants have not installed security cameras in any dorms except one (Elm), defendants do not shakedown the ASH non-smoking tier for tobacco products, the WCC security does not enforce the non-smoking policy on ASH D1 (the non-smoking tier), and defendants failed to install smoke alarms on ASH D1.

Also, Hicks contends defendant Mona Heyse refused to answer Hicks' February 2, 2008, ARP concerning smoking in the non-smoking tier of ASH, defendant ASH unit manager Cheryl Wiley ignores cigarette butts lying on the floor of the ASH non-smoking tier, and Wiley endangered Hicks' safety by telling the other inmates on the non-smoking tier that Hicks had been complaining about them smoking

---

[3] Catapres® is a brand name for Clonidine.

6

there. Hicks also alleges that, as a form of retaliation, Wiley discussed his civil suit concerning tobacco product with two other corrections officers, Sgt. Powell and Sgt. Carpenter, who also told the other inmates Hicks had been complaining about them smoking in the ASH non-smoking tier (Doc. 45). Hicks alleges that as a result, on August 13, 2008, he was attacked by other inmates and suffered a black eye, hearing loss and tinnitus in his left ear, a kidney injury, exacerbation of the herniated disc in his back, a two inch gash in his head which had to be stitched, migraine headaches, and blurred vision in his right eye (Doc. 45). Hicks' previously scheduled medical examination at LSU, the same day of the attack, also revealed a mild concussion (Doc. 45). Hicks contends Wiley watched the attack take place from 25 to 30 feet away and did nothing to stop it (Doc. 45). Hicks further contends Wiley was in charge of investigating the incident and that the inmate who attacked him was never punished (Doc. 40).

Defendants contend in their cross-motion for summary judgment that Hicks failed to exhaust his administrative remedies. Defendants show (Doc. 64, Ex.) in their statement of undisputed facts and an affidavit by Mona Heyse, the quality assurance manager for WCC, that Hicks did not file a grievance about ETS at WCC.

Exhaustion

Section 1997e(a), as amended by the Prison Litigation Reform Act (PLRA), provides that "[n]o action shall be brought with

7

respect to prison conditions under Section 1983...by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002); Booth v. Churner, 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819 (2001). Also, Jones v. Bock, 549 U.S. 199, 211, 237 S.Ct. 910, 918-919 (2007); Days v. Johnson, 322 F.3d 863 (5th Cir. 2003); Clifford v. Gibbs, 298 F.3d 328, 330-331 (5th Cir. 2002); Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001). Resort to a prison grievance process must precede resort to a court. Porter, 534 U.S. at 529, 122 S.Ct. at 990. However, the exhaustion requirement imposed by amended § 1997e is not jurisdictional. Wendell v. Asher, 162 F.3d 887, 890 (5th Cir. 1998). Also, Woodford v. Ngo, 548 U.S. 81, 101, 126 S.Ct. 2378, 2392 (2006). Compliance with prison grievance procedures is all that is required by the PLRA to properly exhaust. Jones, 549 U.S. at 218, 127 S.Ct. at 922-923.

Insofar as Hicks' claim that he was not housed in a tobacco-free tier for a year when he was transferred to WCC, Hicks submitted the WCC policy for the tobacco free tiers (Doc. 7), which states inmates must submit a request form to their housing unit manager in order to be considered for housing in the tobacco free tier. Hicks has provided copies of several inmate request forms (dated April 25, 2007, May 10, 2007, November 4, 2007) he submitted

to be assigned to the tobacco free tier, informing the housing unit manager that ETS was aggravating his asthma (Doc. 7, Exs.). Hicks contends those requests were never responded to by the unit manager. Since WCC required use of the "inmate request form" to gain housing in a tobacco-free tier, Hicks did not err by complying with the WCC requirement to use that form instead of using the prison grievance system. Use of the request form complied with the WCC procedure for a request to be moved to a non-smoking tier, and effectively exhausted Hicks' administrative remedies for his claim that he was not housed in a tobacco free unit for a year.

Hicks also submitted a grievance he filed on January 16, 2008, concerning inmates smoking on the non-smoking tier (Doc. 83, Ex. 1). Mona Heyse states in her second affidavit (Doc. 76) that she had not reviewed Hicks' January 16, 2008, grievance before he filed his complaint in May 2008. Since the warden only has 40 days to respond to a grievance under the provisions of the Louisiana Adult Administrative Remedy Services - LA ADC 22:I.325(G)(1), (2), Heyse failed to review Hicks' grievance in a timely manner. Available administrative remedies are exhausted in compliance with the PLRA when the time limits for the prison's response set forth in the prison grievance procedures have expired. Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004), citing Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998). Therefore, Hicks' effectively exhausted his administrative remedies for his claim of exposure to ETS in a non-

smoking tier at WCC.

Hicks does not appear to have filed a grievance concerning his claim that Wiley told others that he had been complaining and filed a lawsuit concerning inmate smoking in the non-smoking tier. Since Hicks has not exhausted his administrative remedies as to this civil rights claim, it should be dismissed and Hicks' action against Wiley should be dismissed with prejudice.

Environmental Tobacco Smoke Claim

Hicks contends defendants knowingly housed him with smokers and exposed him to second hand smoke, despite his medical history of asthma and hypertension, by initially housing him in a tier that permitted smoking, then by not enforcing the no smoking rule in the non-smoking tier he was eventually moved to. Hicks contends he was housed in the non-smoking tier only two months, then was transferred back to a smoking tier. Hicks contends his constant exposure to second-hand smoke has caused severe problems with his asthma and worsened his hypertension.

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a

conscious disregard of a substantial risk of serious harm.  <u>Farmer</u>
<u>v. Brennan</u>, 511 U.S. 825, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811
(1994).

In <u>Helling v. McKinney</u>, 509 U.S. 25, 33-35, 113 S.Ct. 2475,
2481-482 (1993), the Supreme Court held that prison officials may
violate the Eighth Amendment's prohibition against cruel and
unusual punishment by exposing inmates to an excessive level of
environmental tobacco smoke ("ETS").  The Supreme Court identified
both objective and subjective elements.  Objectively, a plaintiff
must show that he himself is being exposed to unreasonably high
levels of ETS.  The objective factor not only embraces the
scientific and statistical inquiry into the harm caused by ETS, but
also whether society considers the risk to be so grave that it
violates contemporary standards of decency to expose anyone
unwillingly to such a risk.  Subjectively, the plaintiff must prove
deliberate indifference, considering the officials' current
attitudes and conduct and any policies that have been enacted.
Therefore, to obtain relief, a prisoner must prove not only that
the level of ETS to which he is exposed is unreasonable, but also
that prison officials have shown "deliberate indifference" to the
health risks associated with second hand smoke.  The adoption of a
smoking policy bears heavily on the inquiry into deliberate
indifference.  See also, <u>Whitley v. Hunt</u>, 158 F.2d 882, 887-88 (5th
Cir. 1998); <u>Rochon v. City of Angola</u>, 122 F.3d 319, 320 (5th Cir.

11

1997); <u>Wilson v. Lynaugh</u>, 878 F.2d 846 (5th Cir.), cert. den., 493 U.S. 969, 110 S.Ct. 417, 107 L.Ed.2d 382 (1989).

Prisoners have a right not to be exposed to environmental smoke that presents a serious risk to health and to be removed from places where smoke hovers. <u>Reilly v. Grayson</u>, 310 F.3d 519, 521 (6th Cir. 2002), citing <u>Hunt v. Reynolds</u>, 974 F.2d 734 (6th Cir. 1992), and <u>Steading v. Thompson</u>, 941 F.2d 498, 500 (7th Cir, 1991).

Hicks claims he is being denied medical care for a serious medical need due to exposure to ETS. Essentially, Hicks claims he was subjected to unconstitutional conditions of confinement due to unnecessarily high levels of environmental tobacco smoke ("ETS") in violation of the Eighth Amendment and he was denied medical care for a serious medical need through exposure to ETS.

### 1. Objective Component

Hicks alleges he was exposed to ETS almost constantly while incarcerated in Winn Correctional Center.

As discussed above, to show he was exposed to unreasonably high levels of ETS, Hicks must provide statistical and scientific evidence to support the objective component of his burden of proof. The court takes judicial notice, pursuant to Fed.R.Civ.P. rule 201,[4] that the United States Surgeon General's

---

[4] The court may take judicial notice at any stage of the proceeding, including on a motion for summary judgment. Fed.R.Evid. rule 201(f); <u>Brown v. Lippard</u>, 2006 WL 3598524 (5th Cir. Dec. 12, 2006).

In a similar case, the court in <u>Fisher v. Caruso</u>, 2006 WL 2711807, 12 (E.D.Mich.), modified, 2006 WL 2990318 (E.D.Mich. 2006), stated:

"The court takes judicial notice that the Surgeon General has recently concluded that ventilation is insufficient to address the health risks posed by ETS. U.S. Department of Health and Human Services, The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General--Executive Summary, available at http://www.surgeongeneral.gov/library/secondhandsmoke/report/executivesummary.pdf (last visited September 21, 2006). Viewing the facts in the light most favorable to Plaintiff, the court acknowledges the report's conclusion that '[s]eparating smokers and nonsmokers in the same airspace is not effective, nor is air cleaning or a greater exchange of indoor with outdoor air. Additionally, having separately ventilated areas for smoking may not offer a satisfactory solution to reducing ... exposures.' Id. at i. The report further concludes that 'exposure to secondhand smoke remains an alarming public health hazard.' Id. at iii. The court concludes that the recent Surgeon General Report satisfies the evidentiary standard of Federal Rule of Civil Procedure 201. ...Accordingly, a reasonable fact finder could conclude that housing Plaintiff in a facility where the non-smoking policy is consistently and strictly enforced would be the sole efficacious means to prevent a further serious risk of harm to Plaintiff."

See also, <u>Scott v. Hollins</u>, 2006 WL 1994757, *6 (W.D.N.Y. 2006) ("A rational fact-finder could conclude that Drs. Grabo and Augustin would have been on notice of the dangers of ETS as early as 1986, the date of a report of the United States Surgeon General indicating that ETS can cause lung cancer in healthy non-smokers. ...For a medical doctor to state that in 1995 and 1996 he was unaware of the dangers of ETS is simply incredible."); <u>Warren v. Keane</u>, 937 F.Supp. 301, 305-306 (S.D.N.Y. 1996), aff'd, 196 F.3d 330 (2d Cir. 1999) ("In their Memorandum of Law in Response to Defendants' Motion for Summary Judgment, plaintiffs specifically reference a 1986 report by the United States Surgeon General warning of the dangers of ETS. A rational fact-finder could infer from such a report, which would be admissible as an exception to the hearsay rule, that defendants were on notice as to the dangers of ETS. See Fed.R.Evid. 803. Indeed, a rational fact finder could further

June 2006 report concluded that scientific evidence shows there is

no safe level of or exposure to second hand smoke.[5]  Of course,

accept the smoking policy with respect to problem areas at Sing
Sing, to some extent, as an admission by defendants as both to
the dangerousness of ETS and their awareness of such danger.")

[5] The Surgeon General summarized his July 2006 report, at
http://www.surgeongeneral.gov/news/speeches/06272006a.html, as
follows:
    "The Surgeon General's Report that we are releasing
    today, *The Health Consequences of Involuntary Exposure
    to Tobacco Smoke*, documents beyond any doubt that
    secondhand smoke harms people's health. In the course
    of the past 20 years, the scientific community has
    reached consensus on this point.
                    *           *           *
    "I would like to draw your attention to several new
    conclusions that I have reached due to overwhelming
    scientific evidence.
    "Secondhand smoke exposure causes heart disease and
    lung cancer in adults and sudden infant death syndrome
    and respiratory problems in children.
    "There is NO risk-free level of secondhand smoke
    exposure, with even brief exposure adversely affecting
    the cardiovascular and respiratory system.
    "Only smoke-free environments effectively protect
    nonsmokers from secondhand smoke exposure in indoor
    spaces.
    "Finally, the Report concludes that, while great
    strides have been made in recent years in reducing
    nonsmoking Americans' secondhand smoke exposure,
    millions of Americans continue to be exposed to
    secondhand smoke in their homes and workplaces.
                    *           *           *
    "We know that secondhand smoke harms people's health,
    but many people assume that exposure to secondhand
    smoke in small doses does not do any significant damage
    to one's health. However, science has proven that there
    is NO risk-free level of exposure to secondhand smoke.
    Let me say that again: there is no safe level of
    exposure to secondhand smoke.

    "Breathing secondhand smoke for even a short time can
    damage cells and set the cancer process in motion.
    Brief exposure can have immediate harmful effects on
    blood and blood vessels, potentially increasing the

14

defendants may dispute the Surgeon General's report and conclusions

pursuant to the procedures set forth in Fed.R.Civ.P. rule 201.[6]

---

risk of a heart attack. Secondhand smoke exposure can quickly irritate the lungs, or trigger an asthma attack. For some people, these rapid effects can be life-threatening. People who already have heart disease or respiratory conditions are at especially high risk."

[6] As previously discussed, in Fisher v. Caruso, 2006 WL 2711807 (E.D.Mich. 2006), modified in other part, 2006 WL 2990318 (E.D.Mich. Oct 18, 2006), the court took judicial notice, pursuant to Fed.R.Civ.P. rule 201, of the Surgeon General's 2006 report.
The Surgeon General's reports on smoking and tobacco have also been held admissible in federal court pursuant to the public records hearsay exception in Fed. Rules of Evid. rule 903(8), since the reports are prepared pursuant to the Surgeon General's legal obligation "to report new and current information on smoking and health to the U.S. Congress." Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 600 (8th Cir. 2005). See also, Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109 S.Ct. 439 (1988) ("factually based conclusions or opinions [in investigative reports] are not on that account excluded from the scope of Rule 803(8)(C)"); 2 McCormick on Evidence, § 296(C) Investigative Reports (6th ed.) (citing Boerner).
Also, federal judges have taken judicial notice of the Surgeon General's reports pursuant to Fed. Rule of Evid. 201. U.S. v. Sauls, 981 F.Supp. 909, 920 (D.Md. 1997), citing Clemmons v. Bohannon, 918 F.2d 858, 865-868 (10th Cir. 1990), vac'd on other grounds, 956 F.2d 1523 (10th Cir. 1992); Reynolds v. Buck, 833 F.Supp. 518, 519 (E.D.Pa. 1993). See also, Spain v. Brown & Williams Tobacco Company, 363 F.3d 1183 (11th Cir. 2004) (holding tobacco users aware of risks of consuming tobacco products due to Surgeon General's warning in 1965).
In United States v. Philip Morris USA, Inc., 449 F.Supp.2d 1 (D.D.C. 2006), the federal government conducted, at great expense, a civil prosecution under RICO against the dominant members of the tobacco industry, alleging fraud and a conspiracy to deceive American public about health effects of smoking and environmental tobacco smoke, addictiveness of nicotine, health benefits from low tar "light" cigarettes, and manipulation of the design and composition of cigarettes in order to sustain nicotine addiction. The federal government sought disgorgement of the tobacco companies' profits traceable to cigarette sales to addicted youths between 1971 and 2001--an estimated 289 billion

Accordingly, this court accepts the scientific evidence in the Surgeon General's 2006 Report as meeting the objective component of Helling, as well as Helling's requirement of a showing that society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk,

---

dollars--to repay health expenditures the federal government had paid or would pay to treat tobacco-related illnesses. After a nine month trial, the district court held the defendants liable under civil RICO and entered an order prohibiting the use of descriptors such as "light," "mild," and "low tar," enjoining defendants from making misleading statements about their products in the future, directing defendants to issue corrective statements to clear up their prior misrepresentations, requiring defendants to be more transparent by maintaining document depositories and websites, and awarding costs to the government.

In Knight v. City of Tupelo, 2006 WL 3741879, *6 (N.D.Miss. 2006), plaintiffs filed a complaint seeking temporary and permanent injunctions and a declaratory judgment on the grounds that a city-wide smoking ban ordinance enacted in the city of Tupelo, Mississippi violated the state and federal constitutions. The district court found the scientific community has established beyond doubt that smoking is hazardous to both the smoker and his neighbors and that the government and public bear the consequences of tobacco usage through higher health and related costs. The court held the governmental interest in protecting the general public from further health risks clearly outweighs any alleged chilling of individual rights to smoke in public, and upheld the ordinance.

In Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1305-1306 (5th Cir. 1991), the Fifth Circuit held a HUD report was admissible under Rule 803(8), explaining that, while Rule 803 is concerned with hearsay and hearsay is excluded because of the general distrust of out-of-court declarants, Congress has ruled there is a presumption that this distrust should generally not apply to public officials doing their legal duties. See also, Matter of Longstaff, 716 F.2d 1439 (5th Cir. 1983), cert. den., 467 U.S. 1219, 104 S.Ct. 2668 (1984)("that homosexuality is no longer considered a psychopathic condition is established by the opinion of the government's highest medical officer, the Surgeon General").

as also set forth in the Surgeon General's report.[7]

The Fifth Circuit stated in <u>Murrell v. Chandler</u>, 277 F.3d Appx. 341 (5th Cir. 2008), that Murrell's sworn declaration included evidence that he had been assigned to a non-smoking unit but smokers were housed in the same unit, he was exposed to excessive levels of ETS 12 to 24 hours a day in his housing unit and at the factory where he worked, the smoke was often so thick in his housing unit that he had to hold a wet towel over his face to breathe, he advised the defendants that the no smoking policy was not being enforced and that he was having serious health problems including migraine headaches and respiratory problems. The Fifth Circuit noted the defendants had not objected to the court's reliance on the Surgeon General's report and found the evidence created genuine issues of material fact regarding whether Murrell objectively proved he was exposed to unreasonably high levels of ETS and whether the defendants were subjectively deliberately indifferent to his plight.

Following the Fifth Circuit's recent holding in <u>Murrell v. Chandler</u>, 2008 WL 1924198 (5th Cir. 2008), as well as in <u>Murrell v. Casterline</u>, 2008 WL 822237 (5th Cir. 2008), the District Court in

_____

[7] The Surgeon General's report states in conclusion, "Since 1986 the attitude of the public and social norms around secondhand smoke exposure have changed dramatically to reflect a growing viewpoint that the involuntary exposure of nonsmokers to secondhand smoke is unacceptable."

17

White v. King, 2008 WL 5272092 (S.D.Miss. 2008), held there were genuine issues of material fact as to whether the plaintiff was unwillingly exposed to ETS 23 hours a day because most of the inmates housed with him smoked, and that he suffered from coughing, sneezing, eye irritation, and breathing problems caused by the prison officials' failure to enforce no-smoking policies. See also, Wansley v. King, 2008 WL 4066711 (S.D.Miss. 2008); Ware v. Batson, 2008 WL 2773604 (W.D.La. 2008).

This court finds the Surgeon General's report established conclusively that exposure to second hand smoke is unhealthy and dangerous. Hicks' evidence shows he was exposed to second hand smoke almost 24 hours a day every day, and the defendants have not refuted that. Since the objective component of Hicks' burden of proof is satisfied, the court will turn next to consideration of the subjective component of Hicks' burden of proof.

## 2. Subjective Component

Next, Hicks must show defendants were "deliberately indifferent" to the health risks to Hicks associated with second hand smoke. Hicks' claims, and his medical records reflect, that he suffered asthma attacks, increased hypertension, and migraine headaches while incarcerated at WCC, due to exposure to second hand smoke.

The unnecessary and wanton infliction of pain constitutes

18

cruel and unusual punishment forbidden by the Eighth Amendment. Among unnecessary and wanton inflictions of pain are those that are totally without penological justification. In making this determination in the context of prison conditions, a court must ascertain whether the officials involved acted with deliberate indifference to the inmates' health or safety. We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. Hope v. Pelzer, 536 U.S. 730, 737-738, 122 S.Ct. 2508, 2514-2515 (2002), and cases cited therein.

The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811 (1994). A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dept. of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).

The Sixth Circuit court in Reilly, 310 F.3d at 521, found that Reilly suffered from a serious medical condition that was exacerbated by exposure to second-hand smoke, and that the defendants deliberately failed to respond to the repeated

19

recommendations by medical personnel that he be removed to a smoke-free environment in order to avoid further detriment to his health. The court further found that punitive damages were justified by the defendants reckless disregard of Reilly's rights.

Finally, the Fifth Circuit held in <u>Murrell v. Casterline</u>, 2008 wl 822237, *2 (5th Cir. 2008), that Murrell established a genuine issue of material fact concerning whether the defendants were subjectively deliberately indifferent to his exposure to unreasonably high levels of ETS by showing defendants failed to enforce the no-smoking policy at the prison, which caused him to suffer allergic reactions, migraines, and high blood pressure. See also, <u>Murrell v. Chandler</u>, 2008 WL 1924198 (5th Cir. 2008).

Hicks contends he already had asthma and high blood pressure when he was transferred to WCC, and that both conditions have worsened at WCC due to constant exposure to ETS. Hicks contends the fact that tobacco products are sold at the WCC canteen to inmates housed in the non-smoking tiers demonstrates deliberate indifference to his serious medical needs. Hicks submitted the policies which show that specific housing units are designated as smoke-free. Hicks also submitted grievances and numerous requests to be housed in a smoke-free tier due to the effects the living with second-hand smoke was having on his asthma and hypertension - requests ranging from April 2007 (three weeks after he arrived at

WCC) to January 2008 (Docs. 1, 6, 7).[8]

Although there is no policy against smoking at WCC, Louisiana has enacted the Louisiana Smoke Free Air Act (2007), 2006 La. Acts No. 815, in La. R.S. 40:1300.252, et seq.,[9] which prohibits smoking in all public places and, *effective August 15, 2009, prohibits smoking in any state, local, or private correctional facility.* 40 R.S. 1300.255(14). Apparently, CCA has chosen not to implement such a policy at WCC prior to August 15, 2009.

Hicks submitted a copy of the written policy at WCC for the tobacco free tiers, which states that "[s]moking, cigarettes (either opened or unopened) or any form of tobacco is prohibited on this tier" (Doc. 7, Ex. F).

Hicks also submitted numerous affidavits from other inmates. Inmate John Fuselier (Doc. 83, Ex. 5) states in his affidavit that any inmate can be transferred to the non-smoking tier if he requests it and that, while housed in the ASH unit non smoking tier, he observed other inmates housed there in possession of tobacco and smoking. Fusilier further states in his affidavit that he was not required to obtain a medical exam before he was moved to the non-smoking tier of ASH, and that he was moved there on the same day he requested it (Doc. 75).

---

[8] Hicks' complete medical file is not in the record.

[9] Section 1300.252 states in part: "[I]t is in the best interest of the people of this state to protect nonsmokers from involuntary exposure to secondhand smoke in most indoor areas..."

21

Inmate David Allen states in his affidavit (Docs. 75, Ex. F; 83, Exs. 6 & 7) that he resides on the non-smoking tier in ASH unit and that some inmates housed there smoke freely on a daily basis, there are no shake-downs for tobacco, and no attempt is made to enforce the non-smoking rule. Allen also states that inmates ask to go to the non-smoking tier in ASH because it keeps them from having to work in the field, since there is no field work in ASH. Allen further states in an additional affidavit that he witnessed inmates Orlando Wallace attack Hicks because he believed Hicks was the reason he and other inmates had gotten into trouble for possession of and smoking tobacco products in the non-smoking tier of ASH, and that Wiley told Sgt. Powell and Lt. Carpenter about Hicks' lawsuit, and they told the other inmates (Doc. 83, Ex. 8; Doc. 32).

Inmate Willie Noel states in his affidavit (Doc. 83, Ex. 9) that he saw inmate Orlando Wallace attack Hicks because Wallace believed Hicks was the reason he and other inmates had gotten into trouble for possession and smoking tobacco products in the non-smoking tier of ASH, and that Wiley told Sgt. Powell and Lt. Carpenter about Hicks' lawsuit, and they discussed it with other inmates (Doc. 83, Ex. 9).

Hicks also submitted his prison medical records which show his diagnoses of hypertension and asthma (among other things), sick call requests and "unusual occurrence reports" reflecting his

asthma attacks and the breathing treatments administered for the attacks, and episodes of elevated blood pressure (Doc. 83, Exs. 11, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26; Doc. 6, Exs. B, C, D, F, G, H, I, L); Doc. 7, Ex. D,). A medical record submitted by defendants also show Hicks' medical problems with asthma and hypertension (Doc. 64, Ex.).

Pat Thomas, medical director at WCC, states in an affidavit that Hicks arrived at WCC with pre-existing asthma and hypertension, and is currently prescribed blood pressure medication and three asthma inhalers (Doc. 64). Thomas further states in her affidavit that all inmates are screened for smoking at WCC and that those requesting housing on the ASH non-smoking tier must obtain a medical pass verifying their non-smoking status, then their names are placed on a waiting list (Doc. 64).

Warden Tim Wilkinson states in an affidavit (Doc. 64, Ex.) that tobacco products are prohibited on the ASH non-smoking tier, daily random shakedowns of at least three inmates occur there for the purpose of finding contraband items, housing there requires a medical pass that verified the inmate's non-smoking status, and there is a waiting list for housing in the non-smoking tiers. Wilkinson further states there is a smoke alarm but it is not for the detection of tobacco smoke.

However, Hicks alleged in his amended complaint (Doc. 6) that, although the written policy states that inmates caught with tobacco

23

on the non-smoking tier will be removed from the non-smoking tier,
it is not enforced. Hicks contends that Inmate Ronald McClain was
charged with possession of tobacco on the non-smoking tier and he
was not removed.

The failure of CCA and Warden Wilkinson to implement a no-
smoking policy at WCC in 2007, 2008, and 2009 is evidence of
deliberate indifference to the health and safety of all who live
and work within WCC, as well as the serious medical needs of those
such as Hicks, whose health problems are aggravated by second hand
smoke. The Surgeon General's report on the harmful effects of
second hand smoke was published in Jun 2006. Hicks was transferred
to WCC in April 2007. The Louisiana Smoke Free Air Act was enacted
in 2007, and states that it becomes effective in all state, local,
and private correctional facilities in Louisiana in August 2009.
At this point, no prison official (or any other adult) may credibly
allege ignorance of the harmful effects tobacco smoke, both
directly and second-hand, on one's health. Moreover, second-hand
smoke is an asthma trigger[10] and can increase the risk of high blood
pressure.[11]     Therefore,  deliberately  ignoring  a  prisoner's

---

[10]   MEDLINEplus Health Information, Medical Encyclopedia:
Asthma, *available at* http://www.nlm.nih.gov/medlineplus/
encyclopedia.html (a service of the U.S. National Library of
Medicine and the National Institutes of Health).

[11]  MEDLINEplus Health Information, Medical Encyclopedia:
Smoking and smokeless tobacco, *available at* http://
www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the
U.S. National Library of Medicine and the National Institutes of

complaints of the effects constant exposure to second-hand smoke is having on his asthma and hypertension - effects documented in Hicks' prison medical records - is also deliberate indifference.

It is notable that defendants have not provided an affidavit from Wiley, the housing unit manager for the non-smoking tier of ASH, to refute Hicks' allegations and evidence that Wiley permitted inmates to smoke in the non-smoking tier of ASH. Although defendants contend in their statement of material facts (Doc. 40) that Wiley conducts daily shakedowns and, in his affidavit, Warden Wilkinson reiterated the policy against possessing tobacco products on the non-smoking tier and stated the policy for contraband shakedowns, defendants never disputed Hicks' allegation that Wiley ignored tobacco contraband found in the ASH non-smoking unit and permitted inmates to smoke there. Also, defendants have not refuted Hicks' allegations that exposure to second-hand smoke caused his asthma and hypertension to worsen and caused his migraine headaches. Defendants' rely on their arguments as to lack of exhaustion and the prison's policies (See Docs. 64, 76), and have not submitted any evidence to refute the facts of the case as alleged and shown by Hicks in his summary judgment evidence.

Hicks claims Myrle Hardwell, the manager of Elm Unit, refused

Health); MEDLINEplus Health Information, Medical Encyclopedia: High blood pressure (Hypertension), *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

to transfer him from Elm unit to the non-smoking tier of ASH unit. Defendants have shown there was a waiting list for the non-smoking tier, indicating Hardwell was not responsible for the delay in changing his housing. It does not appear there was anything Hardwell, as the manager of Elm unit, could have done about the waiting list. Therefore, Hicks' action against Myrle Hardwell should be dismissed for failure to state a claim cognizable under Section 1983.

Hicks contends Dr. Pacheco and Pat Thomas should have assigned him to a non-smoking unit as soon as he arrived at WCC, since he arrived with a medical history of severe bronchial asthma and hypertension, and also contends they delayed transferring him to the non-smoking tier. Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).

Defendants' summary judgment evidence shows that, after the medical staff finds an inmate needs to be in a non-smoking tier, he is placed on a waiting list. It is not clear whether Hicks could have been placed in a non-smoking tier immediately due to his asthma and hypertension (serious medical needs), or whether he could have been housed somewhere else where no smoking was allowed, such as the infirmary, until he could be placed in a non-smoking tier. If there is simply no place at WCC to immediately house an inmate such as Hicks, who has respiratory problems for which exposure to second hand smoke results in a denial of medical care, then it appears that CCA and Warden Wilkinson are responsible for such an Eighth Amendment violation, rather than Dr. Pacheco and Pat Thomas. Since the court is unable to determine from the evidence of record what other measure could have been taken and who was responsible for failing to take it, there are genuine issues of material fact which preclude a summary judgment against Dr. Pacheco, Pat Thomas, CCA, and Warden Wilkinson on this issue.

However, Hicks contends Wilkinson, Martin, and Morgan were aware he was being subjected to second hand smoke (due to his complaints to the wardens). Hicks contends he wrote to each warden individually to inform them of his situation (Doc. 40). Moreover, Hicks' January 2008 grievance to the wardens' office made Hicks' complaint about second hand smoke in the non-smoking tier very clear (Doc. 75, Ex. H).

Hicks also contends Wilkinson removed him from the non-smoking tier and placed him in a "smoking dorm" (Birch C1-08) in September 2008 (apparently as a result of the August 2008 inmate attack on Hicks), where he is again living with second hand smoke (Doc. 55). Although Wilkinson contends in his affidavit that he has no knowledge of Hicks' personal situation, he has not refuted Hicks' allegation that Wilkinson moved him back to a smoking dorm despite the fact that Hicks had a medical referral for the non-smoking tier. In fact, Wilkinson states in his affidavit that a medical referral is necessary for placement on the non-smoking tier. Therefore, removing Hicks from the non-smoking tier to a smoking tier, with the knowledge that it was medically necessary for Hicks to be on the non-smoking tier, indicates deliberate indifference to Hicks' serious medical needs. Whether or not Wilkinson knew specifically that Hicks had asthma and hypertension which were aggravated by second hand smoke is irrelevant since, according to his own affidavit, Wilkinson knew Hicks had a medical problem which necessitated placement on the non-smoking tier, and he moved Hicks to the smoking tier anyway.

Therefore, there are no genuine issues of material fact which would preclude a summary judgment against Wilkinson, Morgan, and Martin, and in favor of Hicks on the Eighth Amendment claim. Hicks' unrefuted evidence that he informed each warden of his situation and they ignored him, and that Wilkinson returned Hicks

28

to a smoking tier after he had obtained a medical need pass for the non-smoking tier, constitute deliberate indifference to Hicks' health and serious medical needs. Therefore, there are no genuine issues of material fact which would preclude a summary judgment against Wilkinson, Morgan, and Martin on Hicks' Eighth Amendment claim.

Hicks' contention that Connie Green failed to flag the names of inmates housed on non-smoking tiers so she could prevent them from purchasing tobacco products also does not state a Section 1983 claim for violation of Hicks' constitutional rights. Nor does Hicks' claim that inmate banking supervisor Sara McCoy failed to flag the accounts of inmates housed on non-smoking tiers, to prevent them from spending their money on tobacco products, state claim for the violation of a constitutional right under Section 1983. Hicks does not have a constitutional right to have implemented a specific means to control possession of contraband tobacco on the non-smoking tiers, nor has he shown that McCoy or Green were responsible for implementing such measures. Hicks' action against Green and McCoy should be dismissed for failure to state a claim.

Hicks' allegation that Mona Heyse failed to review his grievances also does not state a claim for violation of his constitutional rights. There is no constitutional right to a prison grievance system. See 42 U.S.C. § 1997e(b); <u>Geiger v.</u>

<u>Jowers</u>, 404 F.3d 371, 374 (5th Cir. 1989). Hicks' action against Heyse should be dismissed.

Hicks contends that WCC security (Virgil Lucas and Thomas Glover), as well as ASH unit manager Wiley, failed to screen inmates for tobacco use before housing them on non-smoking tiers, failed to conduct shake-downs for tobacco products, and otherwise failed to check for tobacco products by use of smoke alarms or surveillance monitors. Hicks contends Wiley deliberately ignored evidence of tobacco products on the non-smoking tier of ASH (such as cigarette butts on the floor) and allowed the inmates there to smoke freely. Hicks also alleges that WCC security, Glover and Lucas, did not monitor the non-smoking tier to ensure the inmates there did not possess contraband tobacco. The defendants have not submitted any summary judgment evidence to contradict Hicks' allegations against Wiley, Glover, and Lucas.

Since it is not clear from the record whether Glover and Lucas had actual knowledge that inmates on the ASH non-smoking tier were permitted to smoke and possess tobacco, there are genuine issues of material fact which preclude a summary judgment on the issue of Glover's and Lucas' liability to Hicks on his Eighth Amendment claim. Both Hicks' and defendants' motions for summary judgment should be denied as to Hicks' Eight Amendment claims against Lucas and Glover. However, since Hicks' unrefuted summary judgment evidence establishes Wiley's deliberate indifference to Hicks'

serious medical need, health, and safety, there are no genuine issues of material fact which preclude a summary judgment against Wiley and in favor of Hicks' on his Eighth Amendment claim. Therefore, Hicks' motion for summary judgment against Wiley should be granted at to Hicks' Eighth Amendment claim, and defendants' motion should be denied.

Hicks' has carried his burden of proving both the objective and subjective components of his Eighth Amendment claims against Wilkinson, Wiley, Martin, and Morgan, but there are genuine issues of material fact which preclude a summary judgment on the Eighth Amendment claims involving CCA, Pat Thomas, Dr. Pacheco, Lucas, and Glover. Defendants' motion for summary judgment should be granted in favor of all defendants on Hicks' retaliation claim. Defendants' motion for summary judgment should be granted in favor of Winn Correctional Center, McCoy, Heyse, Green, and Hardwell on all claims and Hicks' action against them should be dismissed.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that defendants' motion for summary judgment be **GRANTED**, that Hicks' action be **DENIED**, and that Hicks' action against Winn Correctional Center, Sara McCoy, Mona Heyse, Connie Green, and Myrle Hardwell be **DISMISSED WITH PREJUDICE** for failure to state a claim cognizable under Section 1983 against those defendants.

IT IS FURTHER RECOMMENDED that defendants' motion for summary

31

judgment be **GRANTED** as to all defendants on the issue of retaliation/failure to protect due to Hicks' failure to exhaust his administrative remedies, that Hicks' motion for summary judgment be **DENIED** on that issue, and that Hicks' claims for retaliation/failure to protect be **DISMISSED WITH PREJUDICE**.

IT IS ALSO RECOMMENDED that Hicks' motion for summary judgment be **GRANTED** against Wilkinson, Wiley, Angie Martin, and Tim Morgan on Hicks' Eighth Amendment claim relating to exposure to second hand smoke, and that those defendants' motion for summary judgment be **DENIED** as to that claim. Only the issue of the amount of damages to which Hicks is entitled remains to be determined.

IT IS FURTHER RECOMMENDED that both Hicks' and defendants' motions for summary judgment be **DENIED** as to Hicks' Eighth Amendment claim against CCA, Pat Thomas, Dr. Pacheco, Lucas, and Glover.

IT IS RECOMMENDED that this case be **REMANDED** to the undersigned Magistrate Judge for further proceedings as to the Eighth Amendment claims against CCA, Pat Thomas, Dr. Pacheco, Lucas, and Glover, and for a determination of the amount of damages that Hicks' is entitled to from Wilkinson, Morgan, Martin, Wiley, Lucas, and Glover on the Eighth Amendment claims.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written

32

objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 27th day of March, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE