U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 2 0 2009

TONY R. MOORE, CLERK
BY _____
                DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


JAMES HOUSTON HICKS,              CIVIL ACTION
          Plaintiff              SECTION "P"
                                 NO. CV08-0687-A
VERSUS

CORRECTIONS CORPORATION OF        JUDGE DEE D. DRELL
AMERICA, et al.,                  MAGISTRATE JUDGE JAMES D. KIRK
          Defendants


SUPPLEMENTAL REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


Defendants' objections (Doc. 127) to the initial Report and Recommendation filed by this court on March 27, 2009 (Doc. 119) were referred to the undersigned Magistrate Judge for consideration (Doc. 131). Hicks filed a response to defendants' objections (Doc. 146).

The parties in this case filed cross-motions for summary judgment (Docs. 46, 70). On March 27, 2009, the undersigned recommended that defendants' motion for summary judgment be granted and Hicks' action against Winn Correctional Center, Sara McCoy, Mona Heyse, Connie Green, and Myrle Hardwell be dismissed for failure to state a claim against them, and that Hicks' action for retaliation/failure to protect be dismissed as to all defendants. It was also recommended that Hicks' motion for summary

judgment be granted against Wilkinson, Wiley, Angie Martin, and Tim Morgan on Hicks' Eighth Amendment claim for exposure to second hand smoke/denial of medical care, that defendants' motion for summary judgment be denied on that claim as to those defendants, and that the case be remanded to the undersigned for further proceedings to determine the amount of damages to which Hicks is entitled.

Finally, it was recommended that both Hicks' and defendants' motions for summary judgment be denied as to Hicks' Eighth Amendment claim against CCA, Pat Thomas, Dr. Pacheco, Lucas, and Glover, and that the case be remanded to the undersigned for further proceedings on those claims.

Defendants filed objections to the Report and Recommendations with new affidavits and medical records[1] (Doc. 127), to which Hicks filed a response in opposition (Doc. 146) and medical records (Doc. 141). Defendants' objections are now before the court for consideration.

### One.

Defendants contend Warden Wilkinson's original affidavit contradicted Hicks' "statement" that he had been exposed to

---

[1] Affidavits and evidence should have been filed with the original brief and motion for summary judgment. Filing new evidence with objections subverts the procedure for having all evidence before the magistrate judge for consideration in order to assist the district judge, is a waste of the court's time, and requires new objections on the new Report and Recommendation, causing both the district judge and the magistrate judge to have to review the case twice. Fed.R.Civ.P. rule 72(b)(3) does not allow submission of new evidence as a matter of course.

significant levels of ETS. Hick contends that being subjected to environmental tobacco smoke was contraindicated by his medical history and his medical records while incarcerated at WCC, and that his medical records show his asthma, hypertension, and migraines were aggravated by exposure to ETS at WCC, which supports his Eighth Amendment claim.

The evidence submitted by Hicks, the Surgeon General's report, and Wilkinson's affidavit are discussed in the original Report and Recommendation. The existence of a policy has not been disputed by Hicks, but there is a general issue as to the enforcement of the policy. Defendants have submitted an additional affidavit by Warden Wilkinson (Doc. 127, Ex.), in which he states that the nonmoving policy is enforced in the nonmoving tiers.[2] Wilkinson's additional affidavit does not add anything new to defendants' evidence and does not change the original recommendation.

Moreover, defendants still misconstrue Hicks' claims; Hick contends he remained on "smoking tiers" for ten months, until January 12, 2008, then moved to a "fake nonmoving tier" (Ash D1) on January 12, 2008, where he stayed for two months, and was then returned to a smoking tier for his "protection." Hick contends that exposure to secondhand smoke aggravated his asthma,

---

[2] It is noteworthy that, to this court's knowledge, at least three other inmates have previously filed suits complaining of inmates smoking in Ash D1 (Peter Roy Alfred-08CV643, Willie James Noel-08CV0018, and Hardy Anderson-07CV1087).

hypertension, and migraines, thus resulting in a denial of medical care and violating the Eighth Amendment. Therefore, even if the nonmoving policy was proven to be enforced on the nonmoving tier, that evidence would be nearly irrelevant since Hicks was housed there only two months. Defendants have not shown they did not house Hicks on the regular, smoking tiers the rest of the time.

Since defendants still have not effectively challenged Hicks' claim of deliberate indifference to his serious medical needs through exposing him to ETS, there is no change in the original recommendation that defendants' motions for summary judgment are denied.

Two.

Defendants contend that Cheryl Wiley's affidavit (submitted with their objections) (Doc. 127, Ex.) confirms Warden Wilkinson's statement that Ash D1 is effectively managed as a nonmoving tier, in contradiction to Hicks' affidavits. Wiley is the housing unit manager for WCC. Defendants' prior failure to submit Wiley's affidavit was noted in the previous Report and Recommendation.[3] Wiley states in her affidavit that she manages Ash D1 as a non-smoking tier and prohibits smoking there, and refutes Hicks' allegation that she saw another inmate attack him. Since Hicks'

---

[3] Defendant suggests that the undersigned "suggested" that Wiley's affidavit was "intentionally omitted" from their response. In fact, I noted only that "defendants have not provided an affidavit from Wiley."

4

submitted inmate affidavits to support his claims, Wiley's affidavit creates a genuine issue of material fact as to whether inmates were smoking in Ash D1 and whether Wiley knew of it.

Therefore, the original recommendation is amended. It is recommended that both defendants' and Hicks' motions for summary judgment should be denied on the issue of whether Wiley violated Hicks' constitutional rights under the Eighth Amendment.

3.

Next, defendants contend the original Report and Recommendation "faults" Warden Wilkinson for failing to implement a complete ban on smoking in WCC prior to the August 15, 2009, deadline provided in Louisiana law. However, "fault" is not assigned. Instead, the undersigned looked at the failure to adopt a smoking policy as indicative of deliberate indifference, in accordance with the Supreme Court's mandate in <u>Helling v. McKinney</u>, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-482 (1993). In <u>Helling</u>, the court stated that, "[s]ubjectively, the plaintiff must prove deliberate indifference, considering the officials' current attitudes and conduct and any policies that have been enacted. The adoption of a smoking policy bears heavily on the inquiry into deliberate indifference." The fact that Wilkinson knew a smoking ban would have to be adopted at least by August 15, 2009, La.R.S. 40:1300.256(14), and was aware not only of the general health risks to all inmates from exposure to ETS (<u>Helling v. McKinney</u> opinion,

5

Surgeon General's 2006 report) and the specific health problems suffered by Hicks from exposure to ETS, the failure to adopt a smoking policy before August 15, 2009, tends to indicate deliberate indifference to Hicks' serious medical needs.

This argument is meritless.

4.

Next, defendants argue the original Report and Recommendation improperly equated the Surgeon General's public comments with the June 2006 report conclusions, and improperly took judicial notice of the comments and the June 2006 report; defendants cite no authority for these contentions. The original Report and Recommendation cites authority to support judicial notice of the Surgeon General's report and further finds the report satisfies the statistical and scientific evidence required to support the objective component of plaintiff's burden of proof as set forth by the Supreme Court in Helling v. McKinney. Since the original Report and Recommendation was issued, another court has taken judicial notice of the Surgeon General's report to satisfy the objective component of the plaintiff's burden of proof. See Sivori v. Epps, 2009 WL 799463 (S.D.Miss. 2009)(inmate plaintiff suffered from asthma and other respiratory problems).

Defendants further contend that the Surgeon General's report is primarily concerned with the secondhand smoke causing lung cancer. To the contrary, a casual glance at the report's Table of

Contents shows it is concerned with reproductive and developmental effects from exposure to secondhand smoke (Chapter 5), respiratory effects in children from exposure to secondhand smoke (chapter 6), cancer among adults from exposure to secondhand smoke (chapter 7), cardiovascular diseases from exposure to secondhand smoke (chapter 8), and respiratory effects in adults from exposure to secondhand smoke (chapter 9), as well as the toxicology (chapter 2), assessment of exposure (chapter 3), prevalence of exposure (chapter 4), and control of exposure (chapter 10).

The original Report and Recommendation stated that this court accepts the scientific evidence in the Surgeon General's 2006 Report as meeting the objective component of Helling, as well as Helling's requirement of a showing that society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk, as also set forth in the Surgeon General's report. For the objective component, a plaintiff must show that he is exposed to "unreasonably high levels" of ETS. The objective factor not only embraces the scientific and statistical inquiry into the harm caused by ETS, but also whether society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Helling v. McKinney, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-482 (1993). According to the Surgeon General's 2006 report, at page 11, "[t]he scientific evidence

indicates that there is no risk-free level of exposure to secondhand smoke." The scientific and statistical data backing that statement is set forth in summary in the Surgeon General's 669 page report. The Surgeon General's 2006 report also states at page 667 of the conclusion: "Clearly, the social norms regarding secondhand smoke have changed dramatically, leading to widespread support over the past 30 years for a society free of involuntary exposures to tobacco smoke. ...Since 1986 the attitude of the public and social norms around secondhand smoke exposure have changed dramatically to reflect a growing viewpoint that the involuntary exposure of nonsmokers to secondhand smoke is unacceptable." Therefore, the report also shows that society considers the risk from secondhand smoke to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

Moreover, defendants' contention that the Surgeon General's report concerns only the link between secondhand smoke and cancer is erroneous (as is defendants' statement in their brief that the studies only "suggested" a causal relationship with cancer). According to the Surgeon General's report, there is sufficient evidence to conclude that more than fifty carcinogens have been identified in sidestream and secondhand smoke, there is a causal relationship between exposure to secondhand smoke (and its condensates) and tumors and increased risk of lung cancer, there

are multiple mechanisms by which secondhand smoke exposure causes injury to the respiratory tract and increases the risk for SIDS, exposure to secondhand smoke has a prothrombotic effect, causes endothelial cell dysfunctions, and causes arteriosclerosis. The report further concludes there is a causal connection between secondhand smoke exposure from parental smoking and numerous respiratory illnesses in children including wheezing, cough, phlegm, breathlessness, asthma, adverse effects on lung function, and a lower level of lung function. The report next concludes there is a causal relationship between exposure to secondhand smoke and coronary heart disease, and the evidence suggests a causal relationship between exposure to secondhand smoke and increased risk of stroke, vascular disease and atherosclerosis. Finally, the report concludes there is a causal relationship between exposure to secondhand smoke and nasal irritation, the evidence suggests a causal relationship between exposure to secondhand smoke and chronic respiratory symptoms, the evidence suggests a causal relationship between short term exposure to secondhand smoke and acute respiratory symptoms among healthy persons (including cough, wheeze, chest tightness, and difficulty breathing), the evidence suggests a causal relationship between short-term exposure to secondhand smoke and an acute decline in lung function in persons with asthma, the evidence suggests a causal relationship between chronic exposure to secondhand smoke and a small decrement in lung

function in the general population, the evidence suggests a causal relationship the evidence suggests a causal relationship between exposure to secondhand smoke and adult-onset asthma as well as a worsening of asthma control, and the evidence suggests a causal relationship between exposure to secondhand smoke and risk for chronic obstructive pulmonary disease. See http://www.surgeon general.gov/library/secondhandsmoke/report/chapter1.pdf.

Furthermore, contrary to defendants' assertions, the Surgeon General found a causal relationship between secondhand smoke and asthma. The Surgeon General's report also states, at pages 557-558, that studies showed that "exposure to secondhand smoke was significantly associated with the exacerbation of any chronic respiratory condition among lifetime nonsmokers," "secondhand smoke exposure was associated with significantly greater bronchial hyper-reactivity and with continuous bronchodilator use," lifetime nonsmokers with asthma who were exposed to secondhand smoke had more acute episodes of asthma, emergency department visits, absences from work, parenteral bronchodilator use, and steroid use, as well as a greater impairment of lung function than unexposed asthma patients, and patients with asthma who were exposed to secondhand smoke had a greater utilization of hospital services and lower quality of life scores compared with unexposed patients.[4]

---

[4] Not all of the studies involved lifetime nonsmokers, as stated by defendants.

The report concluded, at page 558, that the evidence suggests that elimination of secondhand smoke exposure would improve asthma in adults, but there is a need for clinical trials, and that despite the evidence on secondhand smoke exposure and port asthma control, a substantial proportion (43 percent) of persons with asthma presenting for emergency care were exposed to secondhand smoke at home,[5] suggesting a need for greater awareness of this relationship.

Defendants' contention that the Surgeon General's report did not deal concern hypertension is also false. The Surgeon General states, at page 531 of his report, that epidemiologic studies published since the 1986 Surgeon General's report demonstrate convincingly that secondhand smoke is associated with an increased risk for coronary artery disease, with current exposures appearing to be more harmful than past exposures, and states that the same evidence supports the biologic plausibility of an association with stroke risk. The pooled relative risks indicate a 25 to 30 percent increase in the risk of coronary heart disease from exposure to secondhand smoke. See also, Defendants contend the undersigned quoted from the Surgeon General's "public comments," rather than from the report itself. However, the undersigned's quoted material

---

[5] Obviously, an inmate's "home" is his prison; Hicks' "home" is WCC.

11

appears at pages 11[6] of the Surgeon General's report, and at page 667[7] of the report.[8] The undersigned also quoted from the Surgeon General's *executive summary* of his report, and the source of the quote is set forth in the original Report and Recommendation. The Surgeon General concluded in his report, at page 669, "Together, this report and the 2004 report of the Surgeon General, *The Health Consequences of Smoking* (USDHHS 2004), document the extraordinary threat to the nation's health from active and involuntary smoking....Sustained progress toward a society free of involuntary exposures to secondhand smoke should remain a national public health priority."

Defendants' contention that the Surgeon General's report concerned only a lifetime nonsmoker is also not true. Many of the studies utilized dealt with a lifetime nonsmoker, but not all of them.

Defendants also attached an affidavit, without some curriculum

---

[6] The Surgeon General's report states in the "Major Conclusions" section of the Introduction, at page 11, "The scientific evidence indicates that there is no risk-free level of exposure to secondhand smoke."

[7] The Surgeon General's report states in conclusion, at page 667, "Since 1986 the attitude of the public and social norms around secondhand smoke exposure have changed dramatically to reflect a growing viewpoint that the involuntary exposure of nonsmokers to secondhand smoke is unacceptable."

[8] "Since 1986 the attitude of the public and social norms around secondhand smoke exposure have changed dramatically to reflect a growing viewpoint that the involuntary exposure of nonsmokers to secondhand smoke is unacceptable."

vitae, for Dr. Hatahet, who states that he is the head of the biology department at Northwestern State University in Natchitoches, Louisiana. Defendants rely on Dr. Hatahet's affidavit to dispute the findings and conclusions in the Surgeon General's report and attempt to show that ETS did not exacerbate Hicks' asthma, hypertension, and migraine headaches.

Defendants have not laid a proper foundation to qualify Dr. Hatahet as an expert in the effects of secondhand smoke, because there are no curriculum vitae included for Dr. Hatahet and, in his affidavit, he states that he holds a PhD degree in biology (with experience in cancer), not in medicine.[9] Dr. Hatahet's statement in his affidavit (Doc. 127, Ex.), that the Surgeon General's report dealt primarily with cancer is not true, as explained above. The attempt to distinguish Hicks as a past smoker, as opposed to a lifetime nonsmoker, is also irrelevant to the fact that ETS affects both hypertension and asthma. Dr. Hatahet's statement, that asthma and hypertension both have complex etiologies and can be caused and exacerbated by many factors other than ETS, does not exclude ETS as a factor.

Dr. Hatahet's statement that he would not agree that any and

---

[9] The fact that Dr. Hatahet disagrees with the Surgeon General's report is also not relevant, given the fact that his expertise has not been established. Dr. Hatahet's statement, that the Surgeon General's conclusion is too broad and not supported by his evidence, should not be accepted over the Surgeon General's report by this court.

13

all levels of exposure to ETS, no matter how low or how briefly, will cause significant health problems (Doc. 127, Ex.), is irrelevant to this case, which deals with Hicks' near constant exposure to secondhand smoke in the prison (even excepting his two months in the "nonmoving" tier). Dr. Hatahet's statements concerning other carcinogens encountered in daily life are also irrelevant, since Hicks is not complaining of cancer (Doc. 127, Ex.).

As explained in the original Report and Recommendation, it is permissible for this court to take judicial notice of the United States Surgeon General's report and conclusions. See Beech Aircraft Corp. V. Rainey, 488 U.S. 153, 109 S.Ct. 439 (1988); Boerner V. Brown & Williamson Tobacco Co., 394 F.3d 594, 600 (8th Cir. 2005); Spain v. Brown & Williams Tobacco Company, 363 F.3d 1183 (11th Cir. 2004); Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1305-1306 (5th Cir. 1991); Matter of Longstaff, 716 F.2d 1439 (5th Cir. 1983), cert. den., 467 U.S. 1219, 104 S.Ct. 2668 (1984); U.S. v. Sauls, 981 F.Supp. 909, 920 (D.Md. 1997), citing Clemmons v. Bohannon, 918 F.2d 858, 865-868 (10th Cir. 1990), vac'd on other grounds, 956 F.2d 1523 (10th Cir. 1992); Reynolds v. Buck, 833 F.Supp. 518, 519 (E.D.Pa. 1993); Fisher v. Caruso, 2006 WL 2711807 (E.D.Mich. 2006), modified in other part, 2006 WL 2990318 (E.D.Mich. Oct 18, 2006); United States v. Philip Morris USA, Inc., 449 F.Supp.2d 1 (D.D.C. 2006).

14

It is also noted that defendants did not provide Dr. Hatahet with all of Hicks' medical records; instead, they only gave him the three page intake medical screening which was completed when Hicks initially arrived at WCC. As previously stated, Hicks' medical records show that he was told to avoid tobacco smoke due to exacerbation of his asthma, hypertension, and migraine headaches (Doc. 83, Exs. 11, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26; Doc. 6, Exs. B, C, D, F, G, H, I, L); Doc. 7, Ex. D,). Thus, Hicks attempted to show he had been subjected to unreasonable levels of secondhand smoke through his medical records, which indicate he is not supposed to be around *any* amount of secondhand smoke. Therefore, Hicks has not only shown that he had a serious medical need to be away from secondhand smoke, he has shown that involuntarily subjecting him to secondhand smoke constituted cruel and unusual punishment due to his asthma, hypertension, and migraines. Defendants did not submit any evidence with their motion for summary judgment or their objections which rebuts plaintiff's evidence and shows that plaintiff was not subjected to secondhand smoke while incarcerated in WCC.

Therefore, this argument is meritless.

5.

Defendants contend, erroneously, that the original Report and Recommendation equates the Surgeon General's 2006 report on secondhand smoke with the Eighth Amendment standard of care. The

15

original Report and Recommendation states that the Surgeon General's report provides the statistical and scientific evidence required to fulfill the *objective component* of plaintiff's burden of proof-that Hicks was exposed to unreasonably high levels of secondhand smoke. The Surgeon General's report does not, of course, bear on the *subjective component* of plaintiff's burden of proof (showing defendants were deliberately indifferent to plaintiff's serious medical needs).[10] Therefore, the recommendation that a summary judgment be granted in favor of Hicks did not rest on the Surgeon General's report alone. The undersigned found Hicks' proved deliberate indifference as set forth in the original Report and Recommendation.

Therefore, this argument is meritless.

6.

Defendants contend the original Report and Recommendation improperly interprets the intent and intended scope of the Louisiana Smoke Free Air Act, La.R.S. 40:1300.253, et seq., by suggesting that, upon the passage of this act, as well as the Surgeon General's June 2006 report, no prison official could credibly allege ignorance of the harmful effects of tobacco smoke

---

[10] Defendants point out, correctly, that the undersigned mistakenly cited Murrell v. Chandler, 277 Fed. Appx. 341 (5th Cir. 2008), instead of Murrell v. Casterline, 307 Fed.Appx. 778 (5th Cir. 2008), on page 17 of the original Report and Recommendation.

on one's health. Defendants then argue that the Louisiana Smoke Free Air Act does not conclude that all ETS is scientifically harmful to health,[11] and that smoking is specifically and statutorily allowed in Louisiana prisons prior to August 15, 2009.

First, as discussed above, the Surgeon General's report is sufficient objective evidence to meet the <u>Helling</u> requirement for scientific and statistical evidence that involuntary exposure to any level of ETS constitutes an unreasonable risk of harm to anyone. Of course, in cases where there is no evidence of a current injury or serious medical need, that risk is of future harm.

Second, defendants mistake the difference between smoking being allowed in prisons under state law until August 15, 2009, and

---

[11] To the contrary, the legislative history of the Louisiana Smokefree Air Act expresses concern for the health of nonsmokers who are involuntarily exposed to secondhand smoke, at Acts 2006, No. 815, § 1 (eff. Jan. 1 2007), that:

"it is in the best interest of the people of this state to protect nonsmokers from involuntary exposure to secondhand smoke in most indoor areas open to the public, public meetings, restaurants, and places of employment. The legislature further finds and determines that a balance should be struck between the health concerns of nonconsumers of tobacco products and the need to minimize unwarranted governmental intrusion into and regulation of private spheres of conduct and choice with respect to the use or nonuse of tobacco products in certain designated public areas and in private places. Therefore, the legislature hereby declares that the purpose of this Part is to preserve and improve the health, comfort, and environment of the people of this state by limiting exposure to tobacco smoke."

their Eighth Amendment duty to care for the serious medical needs of inmates and to protect inmates from unwilling exposure to ETS.[12] Since Hicks' medical records make it clear that he is supposed to avoid secondhand smoke due to his hypertension, migraine headaches, and asthma, housing Hicks away from secondhand smoke was within the scope of defendants' duty to care for Hicks' serious medical needs. Defendants did not address the Eighth Amendment issues in their motion for summary judgment and do not address them in their objection to the Report and Recommendation. Compare, Reilly v. Grayson, 310 F.3d 519, 521 (6th Cir. 2002)(the court found that Reilly suffered from a serious medical condition that was exacerbated by exposure to second-hand smoke, that the defendants

---

[12] When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs, e.g., food, clothing, shelter, medical care, and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him but from the limitation which it has imposed on his freedom to act on his own behalf. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994); Hare v. City of Corinth, 74 F.3d 633, 639 (5th Cir. 1996), and cases cited therein. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. Hope v. Pelzer, 536 U.S. , S.Ct. (June 27, 2002), citing Trop v. Dulles, 356 U.S. 86, 100 (1958).

Punishment rises to the level of cruel and unusual only if it involves an unnecessary and wanton infliction of pain. No static test exists that measures whether conditions of confinement are cruel and unusual, for the Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society. Talib v. Gilley, 138 F.3d 211, 213-14 (5th Cir. 1998).

deliberately failed to respond to the repeated recommendations by medical personnel that he be removed to a smoke-free environment in order to avoid further detriment to his health, and that punitive damages were justified by the defendants' reckless disregard of Reilly's rights).

Moreover, as previously discussed, the Supreme Court stated in Helling, 509 U.S. at 34, 113 S.Ct. at 2481, that the Eighth Amendment protects against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain and suffering; therefore, deliberate indifference to both current and future health problems of inmates is actionable under the Eighth Amendment. The court further stated that for the subjective component of the test, deliberate indifference, the court must consider the prison officials' current attitudes and conduct *and any policies that have been enacted.* *The adoption of a smoking policy bears heavily on the inquiry into deliberate indifference.* Helling, 509 U.S. at 36-37, 113 S.Ct. at 2482. Therefore, in accordance with the test set forth by the Supreme Court in Helling, the original Report discussed whether WCC officials had taken any steps to protect Hicks from environmental tobacco smoke, including whether they had adopted any smoking policies.

This argument is also meritless.

7.

Next, defendants contend that Warden Martin and Warden Morgan did not have personal knowledge of Hicks' complaints, arguing that it is Mona Heyse's job to handle grievances for the wardens. Defendants did not make this argument or submit affidavits from Martin and Morgan in their motion for summary judgment. Martin and Morgan now submit identical affidavits with the objections to show they do not remember ever receiving anything from Hicks concerning his exposure to ETS and did not retain any written complaints from Hicks in their files. However, Martin and Morgan do not deny Hicks' claims that he notified them of his problem with ETS - they simply state they do not remember. Also, in their unsigned[13] answers to Hicks' interrogatories and their responses to Hicks' requests for admissions, Morgan and Martin state that Hicks may have written to them concerning tobacco smoke on the ASH D1 non-smoking tier, but they do not have a record of it (Doc. 89, Exs. 4, 5, 12, 13). In response, Hicks contends he sent complaints and requests for transfers to the wardens, but he does not know what they did with them.

Moreover, in their responses to Hicks' interrogatory about whether they "realize there is a problem on Ash D1 with inmates that smoke everyday on a non-smoking tier," Morgan and Martin both state (identically), "Objection - this request does not concern

_____

[13] The answering party must sign the answers, and the attorney who objects must sign any objections. Fed.R.Civ.P. rule 33(b)(5).

discoverable matter pursuant to Rule 26(b). More specifically, the request does not concern any matter, not privileged, that is relevant to the claim or defense of any party, nor is the request reasonably calculated to lead to the discovery of admissible evidence." Thus, although defendants claimed that the interrogatory had nothing to do with their defense, their objections to the Report and Recommendation make it clear that lack of personal knowledge is now their defense.

According to Morgan's and Martin's affidavits, there is now a genuine issue of material fact as to whether Morgan and Martin had personal knowledge that Hicks was denied proper medical care through being subjected to second hand smoke while incarcerated in WCC. Therefore, the original recommendation as to Morgan and Martin is amended. Both defendants' and Hicks' motions for summary judgments should be denied on the issue of Morgan's and Martin's liability on Hicks' denial of medical care/Eighth Amendment claim.

8.

Defendants also contend the original Report and Recommendation incorrectly concluded that Hicks exhausted his administrative remedies on the ETS exposure claim because, defendants claim, Hicks failed to file his first-step grievance "within ninety days." Defendants do not state what specific incident the ninety days was supposed to run from. Since Hicks claims on-going violations of his right to not be involuntarily exposed to ETS and denial of

21

medical care through continued exposure to ETS, he has alleged a continuing violation of his constitutional rights. Therefore, the ninety day period in which to file his first-step grievance began to run anew every day and Hicks was not "late" in filing his first step grievance.

This argument is meritless.

9.

Defendants next allege the original Report and Recommendation erred in concluding that defendants could not rebut Hicks' allegation of aggravation of his medical conditions by the ETS. The original report noted that Hicks' medical records supported his claims of aggravation of his serious medical conditions, some of which were generated by the WCC medical staff, a fact which defendants have not addressed in their objections (Doc. 83, Exs. 11, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26; Doc. 6, Exs. B, C, D, F, G, H, I, L); Doc. 7, Ex. D; (Doc. 64, Ex.). Instead defendants contend the undersigned relied on the Surgeon General's report for causation. However, as previously noted, the Surgeon General's report *only* provided the scientific and statistical evidence to show there are no safe levels of exposure to environmental tobacco smoke.

This argument is meritless.

10.

Defendants contend the original Report and Recommendation improperly took judicial notice of various websites and medical data, specifically, the medical encyclopedia in medlineplus.gov. MedlinePLUS is a federal government website, sponsored by the National Library of Medicine and the National Institutes of Health, which is routinely used in this district and in other courts. The incidental references to medical definitions, with appropriate citations, are informational only and do not purport to form any basis for the ultimate conclusions reached. <u>Bowie ex rel. Bowie v. Barnhart</u>, 194 Fed.Appx. 241 (5th Cir. 2006). Furthermore, defendants have not shown any of the definitions are incorrect nor have they submitted alternative definitions. Therefore, the references are appropriate, and this argument is meritless.

11.

Finally, defendants contend the original Report and Recommendation improperly concluded the plaintiff had submitted sufficient medical evidence to defeat defendants' motion for summary judgment. Again, the undersigned found Hicks' medical records supported his contention that his conditions had been aggravated and he needed to avoid exposure to second hand smoke due to problems with his asthma, hypertension, and migraine headaches, and that defendants did not offer any medical evidence that countered Hicks' medical evidence (Doc. 83, Exs. 11, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26; Doc. 6, Exs. B, C, D, F, G,

H, I, L); Doc. 7, Ex. D; (Doc. 64, Ex.). This argument is meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that both defendants' and Hicks' motions for summary judgments should be DENIED on the issues of Wiley's, Morgan's, and Martin's liability to Hicks' on his Eighth Amendment claims.

IT IS FURTHER RECOMMENDED that the remainder defendants' objections to the original Report and Recommendation be OVERRULED. All other previous recommendations remain the same.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM**

**ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 20th day of August, 2009.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE